## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ARTIE DALE PHILLIPS, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> SMITHSONIAN INSTITUTION, <br><br> Defendant. | Case No. 19-cv-11852 <br><br> **CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Artie Dale Phillips ("Plaintiff"), individually and on behalf of himself and all others similarly situated, by and through his attorneys, makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself and his counsel, which are based on personal knowledge.

## **INTRODUCTION**

1.      Between June 24, 2016 and July 30, 2016, defendant Smithsonian Institution rented, exchanged, and/or otherwise disclosed personal information about Plaintiff Artie Dale Phillips's *Smithsonian* magazine subscription to data aggregators, data appenders, data cooperatives, and list brokers, among others, which in turn disclosed his information to aggressive advertisers, non-profit organizations, and other third-party companies.  As a result, Mr. Phillips has

received a barrage of unwanted junk mail.  By renting, exchanging, and/or otherwise disclosing Mr. Phillips's Personal Reading Information (defined below) between June 24, 2016 and July 30, 2016, Smithsonian violated Michigan's Preservation of Personal Privacy Act, H.B. 5331, 84th Leg. Reg. Sess., P.A. No. 378, §§ 1-4 (Mich. 1988), *id.* § 5, added by H.B. 4694, 85th Leg. Reg. Sess., P.A. No. 206, § 1 (Mich. 1989) (the "PPPA").[1]

2.      Documented evidence confirms these facts.  For example, a list broker, Lake Group Media, Inc. ("LGM"), offers to provide renters access to the Personal Reading Information of 2,016,125 U.S. subscribers to *Smithsonian* magazine (as of June 6, 2019), at a base price of "$105.00/M [per thousand]," (i.e., 10.5 cents apiece), as shown in the following screenshot of the "Smithsonian Magazine Enhanced Database" page on LGM's website:

---

[1] In May 2016, the Michigan legislature amended the PPPA. *See* S.B. 490, 98th Leg., Reg. Sess., P.A. No. 92 (Mich. 2016) (codified at M.C.L. § 445.1711, *et seq.*). The May 2016 amendment to the PPPA, which became effective on July 31, 2016, does not apply retroactively to claims that accrued prior to its July 31, 2016 effective date. *See Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 439-41 (S.D.N.Y. 2016) (holding that "the amendment to the [PP]PA does not apply to Plaintiffs' claims, and the Court will assess the sufficiency of those claims under the law as it was when Plaintiffs' claims accrued.") (citing *Landgraf v. USI Film Prods.*, 511 U.S. 224, 286 (1994)). Because the claims alleged herein accrued, and thus vested, prior to the July 31, 2016 effective date of the amended version of the PPPA, the pre-amendment version of the PPPA applies in this case.  *See Horton v. GameStop, Corp.*, No. 18-cv-00596-GJQ-PJG, Dkt. 18 at 3-5 (W.D. Mich. 2018).

# Smithsonian

## SMITHSONIAN MAGAZINE ENHANCED DATABASE

| | | |
|---|---|---|
| 2,016,125 | Enhanced Masterfile | $105.00/M |
| 1,757,882 | Mail Order Buyers | +$ 15.00/M |
| | Fundraiser Rate | $ 85.00/M |
| | Catalog Rate | $ 85.00/M |
| | Non-Profit Rate | $ 90.00/M |

This SMITHSONIAN MAGAZINE database reaches subscribers who are among the most powerful and progressively affluent audience available in the marketplace today. These subscribers to SMITHSONIAN MAGAZINE are enhanced with Acxiom's InfobaseX consumer demographic data, which includes age, income, purchase and lifestyle behavior. This file offers a core consumer group with tremendous buying power.

SMITHSONIAN is one of the largest and most influential publications in the nation. SMITHSONIAN educates, excites, entertains and inspires its readers with its powerful articles on the arts, environment, history, technology and the culture of our time. These readers are educated, affluent customers with a thirst for knowledge and a passion for life.

Additional selects available, please inquire

Select by Community Involvement (causes supported financially) at $15.00/M extra:
- Donate to Cultural Causes
- Animal Welfare
- Arts or Cultural
- Children's
- Environment or Wildlife
- Health
- Political
- Political - Conservative
- Political - Liberal
- Religious
- Veterans

Select by Marital Status at $15.00/M extra:
- Married
- Single

Select by Health Interest at $20.00/M extra:
- Health/Arthritis
- Health/Cholesterol
- Health/Diabetic
- Health/Medical-General
- Health/Homeopathic
- Health/Orthopedic

Select by income at $15.00/M extra:
- $ 19,999 and under
- $ 20,000 - $ 29,999
- $ 30,000 - $ 39,999
- $ 40,000 - $ 49,999
- $ 50,000 - $ 74,999
- $ 75,000 - $ 99,999
- $100,000 - $149,999
- $150,000 and up

Select by customer age at $15.00/M extra (can select by two year increments):
- 18 - 29
- 30 - 39

**LAST UPDATE:**
June 6, 2019

**GENDER:**
43% MALE/36% FEMALE

**MINIMUM ORDER:**
5,000

**SOURCE:**
99% DIRECT MAIL

**MEDIA:**
| | |
|---|---|
| FTP | @ $50.00/F |
| CD-Rom | @ $35.00/F |
| Diskette | @ $35.00/F |

**UNIT OF SALE:**
$38.00/YR (12 ISSUES)

**UPDATE FREQUENCY:**
Monthly

**SELECTION:**
| | |
|---|---|
| Customer Age | @ $15.00/M |
| Child Age | @ $15.00/M |
| Presence/Child | @ $ 5.00/M |
| Child Gender | @ $10.00/M |
| #/Children | @ $ 7.00/M |
| Community Involvement | @ $15.00/M |
| Education | @ $15.00/M |
| Gender | @ $ 8.00/M |
| Health Interest | @ $20.00/M |
| Income | @ $15.00/M |
| Net Worth | @ $15.00/M |
| M.O. Buyers | @ $15.00/M |
| D.M. Donors | @ $15.00/M |
| Ethnicity | @ $15.00/M |
| Religion/Religious | @ $15.00/M |
| Mail Resp | @ $ 8.00/M |
| Marital Stat | @ $15.00/M |
| Lifetrait | @ $15.00/M |
| Homeowner | @ $10.00/M |
| Personicx | @ $35.00/M |
| Paid | @ $10.00/M |
| Source | @ $11.00/M |
| Monthly H/L | @ $16.00/M |
| 3 Mos H/L | @ $12.00/M |
| 6 Mos H/L | @ $10.00/M |
| 12 Mos H/L | @ $ 5.00/M |
| SCF | @ $ 6.00/M |
| State | @ $ 6.00/M |

*See* Compl., **Exhibit A** hereto.

3.     Renters of the "Enhanced Masterfile" of *Smithsonian* subscribers from LGM are able to access the Personal Reading Information of each *Smithsonian* magazine subscriber based on, but not limited to, such intimate and highly-detailed demographic and personal information as the subscriber's age, gender, marital status, income, net worth, educational background, ethnicity, religious affiliation, whether the person is a homeowner, whether he or she has children (and, if so, the age and gender of each of his or her children), particular health interests (e.g., whether the person is concerned about arthritis, high cholesterol, diabetes, etc.), types of community involvement (e.g., whether the person is a veteran, participates in liberal or conservative causes, cares about animal welfare, donates to cultural causes, etc.), and the presence of particular life traits for the person (such as, e.g., whether the person is a mountain biker, hiker, stamp collector, golfer, likes to cook, is an autoworker or mechanic, collects antiques, enjoys gardening, likes to watch NASCAR on Sundays, is a fly fisherman (or fisherwoman), and the list goes on).  *See* Ex. A at 1-3.

4.     That Smithsonian has allowed such intimate personal information about each of its over two million *Smithsonian* subscribers to be trafficked on the open market in this way is quite frankly offensive to any consumer's reasonable expectation of privacy.

5.     A partial list of entities that have already purchased *Smithsonian*

4

subscribers' Personal Reading Information, together with the various other highly-detailed demographic data outlined above for each person, is also provided on LGM's website, as shown below:

```
USAGE:
American Friends of Blind Greece
Archaeology Magazine
Biblical Archaeology Review
California Academy of Science
Dallas Museum Of Art
Direct Wines
Forbes Media LLC.
Franklin Institute, The
Harvard Health Letter
Harvard Men's Health Watch
Harvard Women's Health Watch
Maryland Public TV
National Geographic Partners
Perot Museum of Nature & Science
Saturday Evening Post
Southwest Art Magazine
Traveler Magazine
Trustees of Reservations
Woodworkers Journal
Zoo Consortium
```

*See* Compl., Ex. A at 3.

6.     The Personal Reading Information of another 1,120,100 active subscribers to *Smithsonian* magazine is available for sale on another page of LGM's website, *see* Complaint, **Exhibit B** hereto.  The list of entities that have purchased access to this list of over 1 million active *Smithsonian* magazine subscribers is shown below, as reflected on LGM's website:

5

**USAGE:**

Alameda Health System
Alzheimers Assn./Health Care Ctr.
American Cancer Society
American Indian College Fund
American Museum Natural History
American Red Cross
Arbor Day Foundation
Architectural Digest
Arizona Highways
Arlington Partnership
Atlanta Botanical Garden
Autry Museum of the American West
Boston Children's Hospital
Boston Globe, The
Botanic Garden Consortium
Brooklyn Botanic Garden
Brooklyn Museum
Cal Farley's
California Academy of Science
California State Parks Foundation
Capital Area Community Food Bank
Caritas of Austin
Carnegie Museum
Central Park Conservancy
Children's Medical Center Fdtn
Cleveland Magazine
Colonial Williamsburg Foundation
Colorado Public Radio
Commonwealth Club/Calif
Connecticut Explored
Consumer Reports
Country Living Magazine
Denver Museum of Nature & Science
Economist
Food Bank Alliance
Food Banks Consortium
Forbes Media LLC.
Foreign Affairs
Fortune Magazine
Franklin Institute, The
Friends of the Hennepin CountyLib
Frist Center for the Visual Arts
Glide
Golden Gate National Park Conserv
Greater Chicago Food
Greater Public
Gulfshore Life
Habitat for Humanity
Harper's Magazine
High Country News
High Museum Of Art
History Colorado
Holocaust Museum Houston
Hudson Valley Magazine
Humane Society of U.S.
Institute Of Contemporary Art
KCTS Public Television
Kennedy Center
Kimbell Art Museum
KMHD Jazz Radio

Library Foundation (The)
Meals on Wheels Albuquerque
Meals on Wheels Co-Op
Memorial Art Gallery
Memorial Sloan-Kettering
Menil Collection
Midwest Living
Milwaukee Art Museum
Minneapolis/St. Paul Magazine
Monterey Bay Aquarium
MSPCA
National Audubon Society
National Geographic Development
Library Foundation (The)
Meals on Wheels Albuquerque
Meals on Wheels Co-Op
Memorial Art Gallery
Memorial Sloan-Kettering
Menil Collection
Midwest Living
Milwaukee Art Museum
Minneapolis/St. Paul Magazine
Monterey Bay Aquarium
MSPCA
National Audubon Society
National Geographic Development
National Geographic History
National Geographic Magazine
National Mail Marketing
National Park Foundation
National Parks Conservation Assoc
Nelson-Atkins Musuem of Art
New Hampshire Food Bank
New Jersey Monthly
North Carolina Mus Of Art
North Texas Food Bank
Ohio Magazine
Oklahoma Today
Oregon Public Broadcasting
OSF Children's Hospital of IL
Our State Down Home In NC
Palm Beach County Food Bank
Peninsula Humane Society
Perez Art Museum Miami
Pine Street Inn
Public Radio/Television
Public Television
Reader's Digest Magazine
Redwood Empire Food Banks
Regional Food Bank Of NE NY
Rescue Missions
Reuben H. Fleet Science Center
Rhode Island Community Food Bank
Samaritan House San Mateo
San Antonio Museum of Art
San Diego Zoo
Seattle Art Museum
Seattle Art Museum
Sierra Club
Sonoma Land Trust

Seattle Art Museum
Sierra Club
Sonoma Land Trust
Southern Living Magazine
Space Center Houston
SPCA of Texas
St. Jude Children's Hospital
Sunset Magazine
Susan G. Komen Breast Cancer Fnd
Texas Highways
Tri-State Food Bank, Inc.
UNC Public TV
Vanity Fair
VNA Meals on Wheels
Washington Examiner
Washington Post Company
Washingtonian Magazine
Week Publications, Inc.
WETA/Channel 26
WFMT Chicago Public Radio
WHYY
Wichita Art Museum
Wired Magazine
Woman's Day
WTTW/Channel 11
Yankee Magazine
Zoo Consortium

*See* Compl., Ex. B at 1-4.

7.    Smithsonian did not stop there.  Smithsonian also publishes *Air & Space* magazine, and it sells and rents the Personal Reading Information of everyone who subscribes to that magazine too.

8.    These facts are also confirmed by documented evidence. For example, LGM offers to provide renters access to the Personal Reading Information of 170,059 U.S. subscribers to *Air & Space* magazine (as of June 6, 2019), at a base price of "$105.00/M [per thousand]," (i.e., 10.5 cents apiece), as shown in the following screenshot of the "Air & Space Smithsonian Magazine Enhanced Database" page on LGM's website:

## AIR & SPACE SMITHSONIAN MAGAZINE ENHANCED DATABASE

| | | |
|---|---|---|
| 170,059 | Total Masterfile | $105.00/M |
| | Mail Order Buyers | +$ 15.00/M |
| | Fundraiser Rate | $ 85.00/M |
| | Catalog Rate | $ 85.00/M |
| | Non-Profit Rate | $ 90.00/M |

This AIR & SPACE SMITHSONIAN Magazine database reaches subscribers who are among the most powerful and progressively affluent audience available in the marketplace today. These subscribers are enhanced with Acxiom's InfobaseX consumer demographic data, which includes age, income, purchase and lifestyle behavior. This file offers a core consumer group with tremendous buying power.

AIR & SPACE SMITHSONIAN is a bi-monthly magazine that combines top-notch writing with photography and artwork to bring to life the history, culture and technology of aviation and space science - past, present, and future.

AIR & SPACE SMITHSONIAN aims high to reach technology literate Americans who are inspired by the achievement and adventure of aeronautics.
These exceptional individuals have personal lives and careers that continue to soar and they are today's most affluent and astute consumers.

Additional selects available, please inquire.

Select by Community Involvement (Causes Supported Financially) at $15.00/M extra:
- Donate to Cultural Causes
- Animal Welfare
- Children's
- Environment or Wildlife
- Health
- Political
- Political - Conservative
- Religious
- Veterans

Select by Marital Status at $15.00/M extra:
- Married
- Single

Select by Health Interest at $20.00/M extra:
- Health/Beauty
- Health/Cholesterol
- Health/Medical-General

Select by income at $15.00/M extra:
- $ 19,999 and under
- $ 20,000 - $ 29,999
- $ 30,000 - $ 39,999
- $ 40,000 - $ 49,999
- $ 50,000 - $ 74,999
- $ 75,000 - $ 99,999
- $100,000 - $124,999
- $125,000 and up

Select by customer age at $15.00/M extra (can select by two year increments):
- 18 - 29
- 30 - 39
- 40 - 49
- 50 - 59
- 60 - 69
- 70 - 79
- 80 +

**LAST UPDATE:**
June 6, 2019

**GENDER:**
77% MALE/5% FEMALE

**MINIMUM ORDER:**
5,000

**SOURCE:**
99% DIRECT MAIL

**MEDIA:**
| | |
|---|---|
| FTP | @ $50.00/F |
| Diskette | @ $35.00/F |
| CD-Rom | @ $35.00/F |

**UNIT OF SALE:**
$29.00 (7 ISSUES PER YEAR)

**UPDATE FREQUENCY:**
Monthly

**SELECTION:**
| | |
|---|---|
| Customer Age | @ $15.00/M |
| Child Age | @ $15.00/M |
| #/Children | @ $ 7.00/M |
| Community Involvement | @ $15.00/M |
| Presence/Child | @ $ 5.00/M |
| Child Gender | @ $10.00/M |
| Gender | @ $10.00/M |
| Health Interest | @ $20.00/M |
| Income | @ $15.00/M |
| M.O. Buyers | @ $15.00/M |
| D.M. Donors | @ $15.00/M |
| Mail Resp | @ $ 8.00/M |
| Marital Stat | @ $15.00/M |
| Religion/Religious | @ $15.00/M |
| Ethnicity | @ $15.00/M |
| Lifetrait | @ $15.00/M |
| Personicx | @ $35.00/M |
| Homeowner | @ $10.00/M |
| Paid | @ $10.00/M |
| Source | @ $12.00/M |
| Monthly H/L | @ $16.00/M |
| 3 Mos H/L | @ $12.00/M |
| 6 Mos H/L | @ $10.00/M |
| 12 Mos H/L | @ $ 5.00/M |
| SCF | @ $ 6.00/M |
| State | @ $ 6.00/M |
| Zip | @ $ 6.00/M |
| One Per Household | @ $ 5.00/M |
| Key Coding | @ $ 2.00/M |

**NET NAME POLICY:**
85% and $10.00/M RunCharge

Compl., **Exhibit C** hereto.

9.     Like renters of the *Smithsonian* magazine lists above, *see* Compl. Exs. A-B, renters of the "Total Masterfile" of *Air & Space* subscribers from LGM are able to access the Personal Reading Information of each *Air & Space* magazine subscriber based on, but not limited to, such intimate and highly-detailed demographic and personal information as the subscriber's age, gender, marital status, income, net worth, educational background, ethnicity, religious affiliation, whether the person is a homeowner, whether he or she has children (and, if so, the age and gender of each of his or her children), particular health interests (e.g., whether the person is concerned about arthritis, high cholesterol, diabetes, etc.), types of community involvement (e.g., whether the person is a veteran, participates in liberal or conservative causes, cares about animal welfare, donates to cultural causes, etc.), and the presence of particular life traits for the person (such as, e.g., whether the person is a mountain biker, hiker, stamp collector, golfer, likes to cook, is an autoworker or mechanic, collects antiques, enjoys gardening, likes to watch NASCAR on Sundays, is a fly fisherman (or fisherwoman), and the list goes on). *See* Ex. A at 1-3.

10.     A partial list of entities that have already purchased *Air & Space* subscribers' Personal Reading Information, together with the various other highly-detailed demographic data outlined above for each person, is also provided on LGM's website, depicted below:

> **USAGE:**
> Commemorative Air Force
> Hammacher Schlemmer
> National Space Society
> U.S. Naval Institute
> World Jewish Congress Foundation

*See* Compl., Ex. C at 3.

11.     By renting, exchanging, or otherwise disclosing the Personal Reading

Information of its Michigan-based subscribers between June 24, 2016 and July 30,

2016, Smithsonian violated the PPPA.  Subsection 2 of the PPPA provides:

> [A] person, or an employee or agent of the person,
> engaged in the business of selling at retail, renting, or
> lending books or other written materials ... shall not
> disclose to any person, other than the customer, a record
> or information concerning the purchase ... of those
> materials by a customer that indicates the identity of the
> customer.

PPPA § 2.

12.      Accordingly, Plaintiff brings this Class Action Complaint against

Smithsonian for its intentional and unlawful disclosure of its customers' Personal

Reading Information in violation of the PPPA, and for unjust enrichment.

## NATURE OF THE CASE

13.     To supplement its revenues, Smithsonian rents, exchanges, or

otherwise discloses its customers' personal information to data aggregators, data

appenders, data cooperatives, and other third parties – including, on information

and belief, Acxiom, Wiland, and Nextmark – without the written consent of any of
its customers.  The information that Smithsonian discloses to each of these various
third parties includes each subscriber's full name, home address and the fact that
he or she subscribes to *Smithsonian* and/or *Air & Space* magazine (collectively
"Personal Reading Information"), as well as myriad other personal, lifestyle, and
demographic information about each subscriber such as his or her age, gender,
marital status, income, net worth, educational background, ethnicity, religious
affiliation, whether the person is a homeowner, whether he or she has children
(and, if so, the age and gender of each of his or her children), particular health
interests (e.g., whether the person is concerned about arthritis, high cholesterol,
diabetes, etc.), types of community involvement (e.g., whether the person is a
veteran, participates in liberal or conservative causes, cares about animal welfare,
donates to cultural causes, etc.), and the presence of particular life traits for the
person (such as, e.g., whether the person is a mountain biker, hiker, stamp
collector, golfer, likes to cook, is an autoworker or mechanic, collects antiques,
enjoys gardening, likes to watch NASCAR on Sundays, is a fly fisherman (or
fisherwoman), and the list goes on).

14.     By renting, exchanging, or otherwise disclosing – rather than selling –
its customers' Personal Reading Information, Smithsonian is able to disclose the
information time and time again to countless third parties.

15.     Smithsonian's disclosure of Personal Reading Information, and other personal, demographic, and lifestyle information is not only unlawful, but also dangerous because it allows for the targeting of particularly vulnerable members of society.  In fact, almost any organization can rent a customer list from Smithsonian that contains a number of categories of detailed subscriber information.  For example, anyone could rent a list with the names and addresses of all single, Italian women over the age of 70 in Michigan who subscribe to *Smithsonian*, belong to the Catholic church, enjoy gardening, cooking, and boating, and have a net worth of over $2 million and at least two male children over the age of 50; such a list would cost approximately $255.00 per thousand names listed.

16.     While Smithsonian profits handsomely from the unauthorized rental, exchange, and/or disclosure of its customers' Personal Reading Information and other personal information, it does so at the expense of its customers' privacy and statutory rights because Smithsonian does not obtain its customers' written consent prior to disclosing their Personal Reading Information.

## **PARTIES**

17.     Plaintiff Artie Dale Phillips is a natural person and citizen of Royal Oaks, Michigan.  Plaintiff Phillips has been a subscriber to *Smithsonian* magazine for approximately the past decade and was a subscriber to *Smithsonian* magazine between June 24, 2016 and July 30, 2016.  *Smithsonian* magazine is published by

12

Smithsonian. While residing in, a citizen of, and present in Michigan, Plaintiff Phillips purchased his subscriptions to *Smithsonian* magazine directly from Smithsonian. Prior to and at the time he subscribed to *Smithsonian*, Smithsonian did not notify Plaintiff Phillips that it discloses the Personal Reading Information of its customers, and Plaintiff Phillips has never authorized Smithsonian to do so. Furthermore, Plaintiff Phillips was never provided any written notice that Smithsonian rents, exchanges, or otherwise discloses its customers' Personal Reading Information, or any means of opting out. Since subscribing to *Smithsonian*, and between June 24, 2016 and July 30, 2016, Smithsonian disclosed, without consent or prior notice, Plaintiff Phillips's Personal Reading Information to data aggregators, data appenders, and/or data cooperatives, who then supplemented that information with data from their own files. Moreover, during that same period, Smithsonian rented or exchanged mailing lists containing Plaintiff Phillips's Personal Reading Information to third parties seeking to contact Smithsonian's subscribers, without first obtaining Plaintiff Phillips's written consent or even giving him prior notice of the rentals, exchanges, and/or other disclosures. Because Smithsonian rented, exchanged, and/or otherwise disclosed his Personal Reading Information, Plaintiff Phillips has received junk mail from various organizations that do not offer products or services to consumers. These unwarranted mailings waste Plaintiff Phillips's time, money, and resources. These

harassing junk mailings received by Plaintiff Phillips' are attributable to Smithsonian's unauthorized rental, exchange, and/or disclosure of his Personal Reading Information. Because Plaintiff Phillips is entitled by law to privacy in his Personal Reading Information, and because he paid money for his subscription, Smithsonian's disclosure of his Personal Reading Information deprived Plaintiff Phillips of the full set of benefits to which he was entitled as a part of his *Smithsonian* subscription, thereby causing him economic harm. Accordingly, what Plaintiff Phillips received (a subscription without statutory privacy protections) was less valuable than what he paid for (a subscription with accompanying statutory privacy protections), and he would not have been willing to pay as much, if at all, for his *Smithsonian* subscription had he known that Smithsonian would disclose his Personal Reading Information.

18. Defendant Smithsonian Institution operates museums and research centers across the country and publishes the nationally-circulated magazines *Smithsonian* and *Air & Space*. Defendant maintains its principal place of business at 600 Maryland Ave SW, Washington, DC 20002. Defendant does business throughout Michigan and the entire United States.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members

and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.  This Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

20.     The Court has personal jurisdiction over Smithsonian because Plaintiff's claims arose in substantial part from actions and omissions in Michigan, including from Plaintiff's purchase of a *Smithsonian* subscription in Michigan, Smithsonian's direction of such *Smithsonian* subscription into Michigan, and Smithsonian's failure to obtain Plaintiff's written consent in Michigan prior to disclosing his Personal Reading Information, including his residential address in Michigan, to another person, the effects of which were felt from within Michigan by a citizen and resident of Michigan.  Personal jurisdiction also exists over Smithsonian in Michigan because Smithsonian conducts substantial business within Michigan, such that Smithsonian has significant, continuous, and pervasive contacts with the State of Michigan.

21.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Smithsonian does substantial business in this District and a substantial part of the events giving rise to Plaintiff's claims took place within this judicial District.

## FACTUAL BACKGROUND

### *Michigan's Preservation of Personal Privacy Act*

22.     In 1988, members of the United States Senate warned that records of

consumers' purchases and rentals of audiovisual and publication materials offer "a

window into our loves, likes, and dislikes," and that "the trail of information

generated by every transaction that is now recorded and stored in sophisticated

record-keeping systems is a new, more subtle and pervasive form of surveillance."

S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy,

respectively).

23.     Recognizing the need to further protect its citizens' privacy rights,

Michigan's legislature enacted the PPPA "to preserve personal privacy with respect

to the purchase, rental, or borrowing of certain materials," by prohibiting

companies from disclosing certain types of sensitive consumer information.  H.B.

No. 5331, 1988 Mich. Legis. Serv. 378 (West).

24.     Subsection 2 of the PPPA states:

> [A] person, or an employee or agent of the
> person, engaged in the business of selling at retail,
> renting, or lending books or other written materials . .
> . *shall not disclose* to any person, other than the
> customer, a record or information concerning the
> purchase . . . of those materials by a customer that
> indicates the identity of the customer.

PPPA § 2 (emphasis added).

16

25.     Michigan's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought.  The whole process of intellectual growth is one of privacy—of quiet, and reflection.  This intimate process should be protected from the disruptive intrusion of a roving eye."  S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless).

26.     As Senator Patrick Leahy recognized in proposing the Video and Library Privacy Protection Act (later codified as the Video Privacy Protection Act, 18 U.S.C. § 2710), "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes.  And it protects the selection of books that we choose to read."  134 Cong. Rec. S5399 (May 10, 1988).

27.     Senator Leahy also explained why choices in movies and reading materials are so private:  "These activities are at the core of any definition of personhood.  They reveal our likes and dislikes, our interests and our whims.  They say a great deal about our dreams and ambitions, our fears and our hopes.  They reflect our individuality, and they describe us as people."  *Id.*

28.     Michigan's passage of the PPPA also established as a matter of law "that a person's choice in reading, music, and video entertainment is a private matter, and not a fit subject for consideration by gossipy publications, employers,

clubs, or anyone else for that matter." *Privacy: Sales, Rentals of Videos, etc.*, House Legislative Analysis Section, H.B. No. 5331, Jan. 20, 1989 (attached hereto as **Exhibit D**).

29. Despite the fact that thousands of Michigan residents subscribe to Smithsonian's publications, Smithsonian disregarded its legal responsibility by systematically violating the PPPA.

### The Personal Information Market: Consumers' Personal Information Has Real Value

30. In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our lifetimes . . . [and] individuals are concerned about being defined by the existing data on themselves."[2]

31. More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[3]

---

[2] The Information Marketplace: Merging and Exchanging Consumer Data (Mar. 13, 2001), at 8:15-11:16, *available at* https://www.ftc.gov/sites/default/files/documents/public_events/information-marketplace-merging-and-exchanging-consumer-data/transcript.pdf (last visited Jan. 29, 2019).

[3] *See* Web's Hot New Commodity: Privacy, WSJ.com (Feb. 28, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274

32.     The FTC has also recognized that consumer data possesses inherent

monetary value within the new information marketplace and publicly stated that:

> Most consumers cannot begin to comprehend the
> types and amount of information collected by businesses,
> or why their information may be commercially valuable.
> Data is currency. The larger the data set, the greater
> potential for analysis—and profit.[4]

33.     In fact, an entire industry exists while companies known as data

aggregators purchase, trade, and collect massive databases of information about

consumers.  Data aggregators then profit by selling this "extraordinarily intrusive"

information in an open and largely unregulated market.[5]

34.     The scope of data aggregators' knowledge about consumers is

immense:  "If you are an American adult, the odds are that [they] know[] things

like your age, race, sex, weight, height, marital status, education level, politics,

buying habits, household health worries, vacation dreams—and on and on."[6]

---

.html (last visited Jan. 29, 2019).

[4] Statement of FTC Commissioner Pamela Jones Harbour (Dec. 7, 2009), at
2,  *available at*
https://www.ftc.gov/sites/default/files/documents/public_statements/remark
s-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last
visited Jan. 29, 2019) (emphasis added).

[5] *See* Martha C. White, *Big Data Knows What You're Doing Right Now*,
TIME.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-
knows-what-youre-doing-right-now/ (last visited Jan. 29, 2019).

[6] Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*,
N.Y. Times (June 16, 2012), *available at*

35.     Further, "[a]s use of the Internet has grown, the data broker industry has already evolved to take advantage of the increasingly specific pieces of information about consumers that are now available."[7]

36.     Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[8]

37.     In their letter, the co-Chairmen recognized that:

> By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer.  This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[9]

---

http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited Jan. 29, 2019).

[7] Letter from Senator John D. Rockefeller IV, Chairman, Senate Committee on Commerce, Science, and Transportation, to Scott E. Howe, Chief Executive Officer, Acxiom (Oct. 9, 2012) *available at* http://www.commerce.senate.gov/public/?a=Files.Serve&File_id=3bb94703-5ac8-4157-a97b-a658c3c3061c (last visited Jan. 29, 2019).

[8] *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Senator Ed Markey (July 24, 2012), http://www.markey.senate.gov/news/press-releases/bipartisan-group-of-lawmakers-query-data-brokers-about-practices-involving-consumers-personal-information (last visited Jan. 29, 2019).

[9] *Id.*

20

38.     Data aggregation is especially troublesome when consumer

information is sold to direct-mail advertisers.  In addition to causing waste and

inconvenience, direct-mail advertisers often use consumer information to lure

unsuspecting consumers into various scams,[10] including fraudulent sweepstakes,

charities, and buying clubs.  Thus, when companies like Smithsonian share

information with data aggregators, data cooperatives, and direct-mail advertisers,

they contribute to the "[v]ast databases of names and personal information" that

are often "sold to thieves by large publicly traded companies," which "put[s]

almost anyone within the reach of fraudulent telemarketers" and other criminals.[11]

39.     Information disclosures like Smithsonian's are particularly dangerous

to the elderly.  "Older Americans are perfect telemarketing customers, analysts

say, because they are often at home, rely on delivery services, and are lonely for

the companionship that telephone callers provide."[12]  The FTC notes that "[t]he

elderly often are the deliberate targets of fraudulent telemarketers who take

---

[10] *See Prize Scams*, Federal Trade Commission,
http://www.consumer.ftc.gov/articles/0199-prize-scams (last visited Jan. 29, 2019).

[11] Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times,  May
20, 2007, *available at*
http://www.nytimes.com/2007/05/20/business/20tele.html?pagewanted=all&_r=0
(last visited Jan. 29, 2019).

[12] *Id.*

advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[13]

40.     Indeed, an entire black market exists while the personal information of vulnerable elderly Americans is exchanged.  Thus, information disclosures like Smithsonian's are particularly troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[14]

41.     Smithsonian is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue:  disclosing subscriber information to data aggregators, data appenders, data cooperatives, direct marketers, and other third parties is a widespread practice in the publishing industry.

42.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

---

[13] *Fraud Against Seniors:  Hearing before the Senate Special Committee on Aging* (August 10, 2000) (prepared statement of the FTC), *available at* https://www.ftc.gov/sites/default/files/documents/public_statements/prepared-statement-federal-trade-commission-fraud-against-seniors/agingtestimony.pdf (last visited Jan. 29, 2019).

[14] *See id.*

### *Consumers Place Monetary Value on their Privacy and Consider Privacy Practices When Making Purchases*

43.     As the data aggregation and cooperative industry has grown, so too have consumer concerns regarding the privacy of their personal information.

44.     A recent survey conducted by Harris Interactive on behalf of TRUSTe, Inc. showed that 89 percent of consumers polled avoid doing business with companies who they believe do not protect their privacy online.[15]  As a result, 81 percent of smartphone users polled said that they avoid using smartphone apps that they don't believe protect their privacy online.[16]

45.     Thus, as consumer privacy concerns grow, consumers are increasingly incorporating privacy concerns and values into their purchasing decisions and companies viewed as having weaker privacy protections are forced to offer greater value elsewhere (through better quality and/or lower prices) than their privacy- protective competitors.

46.     In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to

---

[15] *See 2014 TRUSTe US Consumer Confidence Privacy Report*, TRUSTe, http://www.theagitator.net/wp-content/uploads/012714_ConsumerConfidenceReport_US1.pdf (last visited Jan. 29, 2019).

[16] *Id.*

sell their personal information themselves.[17]

47.     These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data. Research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[18]

48.     Thus, in today's economy, individuals and businesses alike place a real, quantifiable value on consumer data and corresponding privacy rights.[19]  As such, while a business offers customers a service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer receives a service of less value than the service paid for.

---

[17] *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited Jan. 29, 2019).

[18] *See* Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited Jan. 29, 2019).

[19] *See* Hann, *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Oct. 2003) at 2, *available at* http://citeseerx.ist.psu.edu/viewdoc/download?doi=10.1.1.321.6125&rep=rep1&type=pdf (last visited Aug. 30, 2018) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.")

### *Smithsonian Unlawfully Rents, Exchanges, And Discloses Its Customers' Personal Reading Information*

49.    Smithsonian maintains a vast digital database comprised of its customers' Personal Reading Information.  Smithsonian discloses its customers' Personal Reading Information to data aggregators and appenders who then supplement that information with additional information about each Smithsonian customer, including such intimate and highly-detailed demographic and personal information as the subscriber's age, gender, marital status, income, net worth, educational background, ethnicity, religious affiliation, whether the person is a homeowner, whether he or she has children (and, if so, the age and gender of each of his or her children), particular health interests (e.g., whether the person is concerned about arthritis, high cholesterol, diabetes, etc.), types of community involvement (e.g., whether the person is a veteran, participates in liberal or conservative causes, cares about animal welfare, donates to cultural causes, etc.), and the presence of particular life traits for the person (such as, e.g., whether the person is a mountain biker, hiker, stamp collector, golfer, likes to cook, is an autoworker or mechanic, collects antiques, enjoys gardening, likes to watch NASCAR on Sundays, is a fly fisherman (or fisherwoman), and the list goes on). *See* Ex. A at 1-3. (*See, e.g.*, Compl., Ex. A).

50.    Smithsonian then rents and/or exchanges its mailing lists—which include subscribers' Personal Reading Information identifying which individuals

purchased which magazines, and can include the sensitive information obtained

from data aggregators and appenders—to other data aggregators and appenders,

other consumer-facing businesses, marketing companies, and organizations

soliciting donations, including without limitation, and on information and belief,

Acxiom, Wiland, and Nextmark (*See id.*).

51.     Smithsonian also discloses its customers' Personal Reading

Information to data cooperatives – including, on information and belief, Wiland

and Acxiom – who in turn, give Smithsonian access to their own mailing list

databases.

52.     As a result of Smithsonian's data compiling and sharing practices,

companies can purchase and/or obtain mailing lists from Smithsonian that identify

Smithsonian customers by their most intimate details.  Smithsonian's disclosure of

such sensitive and personal information puts consumers, especially the more

vulnerable members of society, at risk of serious harm from scammers.  For

example, Smithsonian will rent a list – to anyone willing to pay for it – containing

the names and addresses of all single, Italian women over the age of 70 in

Michigan who subscribe to *Smithsonian*, belong to the Catholic church, enjoy

gardening, cooking, and boating, and have a net worth of over $2 million and at

least two male children over the age of 50; such a list would cost approximately

$255.00 per thousand names listed.

53.    Smithsonian does not seek its customers' prior written consent to any of these disclosures and its customers remain unaware that their Personal Reading Information and other sensitive personal information is being rented and exchanged on the open market.

54.    Consumers can sign up for *Smithsonian* and *Air & Space* magazine subscriptions through numerous media outlets, including the Internet, telephone, or traditional mail.  Regardless of how the consumer subscribes, Smithsonian never requires the individual to read or agree to any terms of service, privacy policy, or information-sharing policy.  Consequently, Smithsonian uniformly fails to obtain any form of consent from – or even provide effective notice to – its customers before disclosing their Personal Reading Information.

55.    As a result, Smithsonian disclosed its customers' Personal Reading Information – including their reading habits and preferences that can "reveal intimate facts about our lives, from our political and religious beliefs to our health concerns"[20] – to anybody willing to pay for it.

56.    By and through these actions, Smithsonian has intentionally disclosed to third parties its Michigan customers' Personal Reading Information without consent, in direct violation of the PPPA.

---

[20] *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited Jan. 29, 2019).

## CLASS ACTION ALLEGATIONS

57.     Plaintiff seeks to represent a class defined as all Michigan residents who, at any point in time between June 24, 2016 and July 30, 2016, had their Personal Reading Information disclosed to third parties by Smithsonian Institution without consent (the "Class").  Excluded from the Class is any entity in which the Defendant has a controlling interest, as well as all officers and directors of Defendant.

58.     Members of the Class are so numerous that their individual joinder herein is impracticable.  On information and belief, members of the Class number in the thousands.  The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery.  Class members may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant.

59.     Common questions of law and fact exist as to all Class members and predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:  (a) whether Smithsonian is a "retailer or distributor" of publications (*i.e.*, magazines); (b) whether Smithsonian obtained consent before disclosing to third parties Plaintiff's and the Class's Personal Reading Information; (c) whether Smithsonian's disclosures of Plaintiff's and the Class's Personal Reading Information violated the PPPA; and

28

(d) whether Smithsonian's rental, exchange, and/or disclosure of Plaintiff's and the Class's Personal reading Information constitutes unjust enrichment.

60.     The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful conduct, based upon Defendant's disclosure of Plaintiff's and the Class's Personal Reading Information.

61.     Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of Class members will be fairly and adequately protected by Plaintiff and his counsel.

62.     The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members.  Each individual Class member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the

29

benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**COUNT I**
**Violation of the Preservation of Personal Privacy Act**
**(PPPA § 2)**

63.     Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

64.     Plaintiff brings this claim individually and on behalf of members of the Class against Smithsonian Institution.

65.     As a magazine publisher that sells subscriptions to consumers, Smithsonian is engaged in the business of selling written materials at retail.  *See* PPPA § 2.

66.     By purchasing a subscription to *Smithsonian* magazine, Plaintiff purchased written materials directly from Smithsonian.  *See* PPPA § 2.

67.     Because Plaintiff purchased written materials directly from Smithsonian, he is a "customer" within the meaning of the PPPA.  *See* PPPA § 1.

68.     At various times between June 24, 2016 and July 30, 2016, Smithsonian disclosed Plaintiff's Personal Reading Information, which identified him as a *Smithsonian* magazine subscriber and customer, in at least three ways.

69.     First, Smithsonian disclosed mailing lists containing Plaintiff's Personal Reading Information to data aggregators and data appenders, including without limitation Acxiom and Wiland, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to Smithsonian.

70.     Second, Smithsonian disclosed mailing lists containing Plaintiff's Personal Reading Information to data cooperatives, including without limitation Acxiom and Wiland, who in turn gave Smithsonian access to their own mailing list databases.

71.     Third, Smithsonian rented and/or exchanged its mailing lists containing Plaintiff's Personal Reading Information—enhanced with additional information from data aggregators and appenders—to third parties, including other consumer-facing companies, direct-mail advertisers, and organizations soliciting monetary contributions, and volunteer work, including without limitation Nextmark.

72.     Because the mailing lists included the additional information from the data aggregators and appenders, the lists were more valuable, and Smithsonian was able to increase its profits gained from the mailing list rentals and/or exchanges.

73.     By renting, exchanging, or otherwise disclosing its customer lists, between June 24, 2016 and July 30, 2016, Smithsonian disclosed to persons other

than Plaintiff records or information concerning his purchase of written materials from Smithsonian.  *See* PPPA § 2.

74.    The information Smithsonian disclosed indicates Plaintiff's name and address, as well as the fact that he subscribed *Smithsonian*.  Accordingly, the records or information disclosed by Smithsonian indicate Plaintiff's identity.  *See* PPPA § 2.

75.    Plaintiff and the members of the Class never consented to Smithsonian disclosing their Personal Reading Information to anyone.

76.    Worse yet, Plaintiff and the members of the Class did not receive notice before Smithsonian disclosed their Personal Reading Information to third parties.

77.    On information and belief, Smithsonian's disclosures of Plaintiff's and the Class's Personal Reading Information between June 24, 2016 and July 30, 2016 were not made pursuant to a court order, search warrant, or grand jury subpoena.

78.    Smithsonian's disclosures of Plaintiff's and the Class's Personal Reading Information between June 24, 2016 and July 30, 2016 were not made to collect payment for their subscriptions.

79.    Smithsonian's disclosures of Plaintiff's Personal Reading Information between June 24, 2016 and July 30, 2016 were made to data aggregators, data

appenders, data cooperatives, direct-mail advertisers, and organizations soliciting monetary contributions, and volunteer work—all in order to increase Smithsonian's revenue. Accordingly, Smithsonian's disclosures were not made for the exclusive purpose of marketing goods and services directly to Plaintiff and the members of the Class.

80. By disclosing Plaintiff's Personal Reading Information between June 24, 2016 and July 30, 2016, Smithsonian violated Plaintiff's and the Class's statutorily-protected right to privacy in their reading habits. *See* PPPA § 2.

81. Additionally, because Plaintiff and the members of the Class paid for their subscriptions to Smithsonian's publications, and Smithsonian was obligated to comply with the PPPA, Smithsonian's unlawful disclosure of Plaintiff's and the other Class members' Personal Reading Information deprived Plaintiff and the Class members of the full value of their paid-for subscriptions. Because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, Smithsonian's unlawful rental, exchange, and/or other disclosure of their Personal Reading Information caused them to receive less value than they paid for, thereby causing them economic harm.

82. Likewise, because Plaintiff and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, a magazine publication subscription that keeps their Personal Reading Information private is

more valuable than one that does not.

83.     Accordingly, had Plaintiff been adequately informed of Smithsonian's disclosure practices, he would not have been willing to purchase his *Smithsonian* subscription at the price charged, if at all.  Thus, Smithsonian's unlawful disclosures caused Plaintiff economic harm.

84.     Smithsonian's disclosure of Plaintiff's Personal Reading Information to third parties has also caused an influx of third-party print advertisements.

85.     As a result of Smithsonian's unlawful disclosure of their Personal Reading Information between June 24, 2016 and July 30, 2016, Plaintiff and the members of the Class have suffered privacy and economic injuries.  On behalf of himself and the Class, Plaintiff seeks: (1) actual damages, including disgorgement, or $5,000.00, whichever is greater, per Class member pursuant to PPPA § 5(a); and (2) costs and reasonable attorneys' fees pursuant to PPPA § 5(b).

## COUNT II
### Unjust Enrichment

86.     Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

87.     Plaintiff brings this claim individually and on behalf of members of the Class against Smithsonian Institution.

88.     Plaintiff and the Class members conferred benefits on Smithsonian by providing Smithsonian with their Personal Reading Information and paying

34

Smithsonian for their magazine publication subscriptions.

89.    Smithsonian received and retained the information and money belonging to Plaintiff and the Class when Plaintiff and the Class subscribed to Smithsonian's publications.

90.    Because Smithsonian received and processed Plaintiff's and the Class's subscription payments and Personal Reading Information, and because Smithsonian has employees and/or agents handling customer accounts and billing as well as customer data, Smithsonian appreciates or has knowledge of such benefits.

91.    Under the PPPA, Plaintiff and the Class members were entitled to confidentiality in their Personal Reading Information as part of their subscriptions.

92.    Under principles of equity and good conscience, because Smithsonian failed to comply with the PPPA between June 24, 2016 and July 30, 2016, Smithsonian should not be allowed to retain the full amount of money Plaintiff and the Class paid for their subscriptions or the money it received by renting, exchanging, and/or otherwise disclosing Plaintiff's and the Class's Personal Reading Information between June 24, 2016 and July 30, 2016.

93.    Moreover, Smithsonian should not be allowed to retain the monies it received as a result of renting, exchanging, and/or otherwise disclosing Plaintiff's and the Class's Personal Reading Information between June 24, 2016 and July 30,

2016.

94.    Plaintiff and the other Class members have suffered actual damages as a result of Smithsonian's unlawful conduct in the form of the value Plaintiff and the other Class members paid for and ascribed to the confidentiality of their Personal Reading Information.  This amount is tangible and will be calculated at trial.

95.    Additionally, Plaintiff and the Class members have suffered actual damages inasmuch as Smithsonian's failure to inform them that it would disclose their Personal Reading Information caused them to purchase magazine publication subscriptions when they otherwise would not have.

96.    Further, a portion of the purchase price of each Smithsonian magazine subscription sold to Plaintiff and the other Class members was intended to ensure the confidentiality of Plaintiff's and the other Class members' Personal Reading Information, as required by the PPPA.  Because Plaintiff and the other Class members were denied services that they paid for and were entitled to receive—i.e., confidentiality of their Personal Reading Information—and because Plaintiff and the Class would have commanded a discount to voluntarily forego those benefits, they incurred actual monetary damages.

97.    To prevent inequity, Smithsonian should return to Plaintiff and the Class the value they ascribe to confidentiality of their Personal Reading

Information and all money derived from Smithsonian's rental, exchange, and/or

other disclosure of Plaintiff's and the Class's Personal Reading Information

between June 24, 2016 and July 30, 2016.

98.    Accordingly, Plaintiff and the Class members seek an order declaring

that Smithsonian's conduct constitutes unjust enrichment, and awarding Plaintiff

and the Class restitution in an amount to be calculated at trial equal to the amount

of money obtained by Smithsonian through its rental, exchange, and/or other

disclosure, between June 24, 2016 and July 30, 2016, of Plaintiff's and the Class's

Personal Reading Information.

## **<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly

situated, seeks a judgment against Defendant as follows:

A.    For an order certifying the Class under Rule 23 of the
Federal Rules of Civil Procedure and naming Plaintiff as
representative of the Class and Plaintiff's attorneys as
Class Counsel to represent the Class;

B.    For an order declaring that Defendant's conduct as
described herein violates the Preservation of Personal
Privacy Act, PPPA;

C.    For an order finding in favor of Plaintiff and the Class on
all counts asserted herein;

D.    For an award of actual damages or $5,000, whichever is
greater, to Plaintiff and each Class member, as provided by
the Preservation of Personal Privacy Act, PPPA § 5(a);

E.   For prejudgment interest on all amounts awarded;

F.   For an order of restitution and all other forms of equitable monetary relief;

G.   For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all causes of action and issues so triable.


Dated:  June 24, 2019                   Respectfully submitted,

**ARTIE DALE PHILLIPS**,

By:___/s Philip L. Fraietta_____
One of Plaintiff's Attorneys

Joseph I. Marchese
jmarchese@bursor.com
Philip L. Fraietta
pfraietta@bursor.com
BURSOR & FISHER, P.A.
888 Seventh Avenue
New York, New York 10019
Tel: 646.837.7150
Fax: 212.989.9163

Frank S. Hedin
fhedin@hedinhall.com
David W. Hall*
dhall@hedinhall.com
HEDIN HALL LLP
1395 Brickell Avenue, Suite 900
Miami, Florida 33131
Tel: 305.357.2107
Fax: 305.200.8801

Nick Suciu III
nicksuciu@bmslawyers.com
BARBAT, MANSOUR & SUCIU PLLC
1644 Bracken Road
Bloomfield Hills, Michigan 48302
Tel: 313.303.3472

*Application for Admission Forthcoming

*Counsel for Plaintiff Artie Dale Phillips*